Gerald Singleton, OSB No. 210955
gsingleton@singletonschreiber.com
Susan B. Dussault, OSB No. 021125
sdussault@singletonschreiber.com
Stephen J. Hill, OSB No. 240164
shill@singletonschreiber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel.  (619) 771-3473

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| TRACI ENFIELD; MARK G. ENFIELD, JR.;A.E. through their parent and guardian TRACI ENFIELD; T.E., through their parent and guardian TRACI ENFIELD; A.E., through her parent and guardian SHANDI CHRISTIANSON; L.E., through his parent and guardian SHANDI CHRISTIANSON; P.E., through his parent and guardian SHANDI CHRISTIANSON; E.R.C., through her parent and guardian JAMES ALLAN CURTIS; L.A.C., through her parent and guardian JAMES ALLAN CURTIS; LORRIE DALE DOVER; H.D., through her parent and guardian GARY DYE; K.R., through his parent and guardian ELISHA GOODRICK; X.R., through his parent and guardian ELISHA GOODRICK;  W.W.W., through his parent and guardian  ALEXANDRIA CHAMBERLIN BLANTON; N.E.G., through her grandparent and guardian KELLY LEATHERWOOD; P.W., through her parent and guardian MICHELLE KEASLING; K.G., through her parent and guardian OLIVIA KILPATRICK; STEPHANIE LYNN STUMP; MICHAEL LE TERNEAU; ELIZABETH LEE; J.D.L., through his parent and guardian COURTNEY LEWIS; J.L., through his parent and guardian COURTNEY LEWIS;  K.L., through her parent and guardian COURTNEY LEWIS; A.L., through her parent and guardian ELIZABETH MAY LIVINGSTON;  An.L., | Case No. **COMPLAINT** **Negligence, Trespass. and Nuisance** DEMAND FOR JURY TRIAL on all Claims So Triable |

through her parent and guardian
ELIZABETH MAY LIVINGSTON; A.M.,
through her parent and guardian
JENNIFER MARSHALL; E.M. through
her parent and guardian JENNIFER
MARSHALL; L.M., through her parent
and guardian JENNIFER MARSHALL;
LEYLA ROCHELLE MUCK; LONDON
MUDD;  JULIETTE CORPENING;
A.H.C., through her parent and guardian
KARIN NEGRETE; AL.O., through her
parent and guardian ALVARO OCHOA;
A.O., through his parent and guardian
ALVARO OCHOA; E.O., through her
parent and guardian ALVARO OCHOA;
YVETTE OYERVIDES; A.P., through his
parent and guardian ALYSSA PANICCIA;
G.P., through her parent and guardian
ALYSSA PANICCIA; C.C., through his
parent and guardian ANGELIQUE
CASTRO; M.C., through her parent and
guardian ANGELIQUE CASTRO; R.C.,
through his parent and guardian
ANGELIQUE CASTRO; NEVEAH
GROGGINS; J.R.P., through her parent
and guardian BRITTANY R. PETRENY;
J.J.P., through his parent and guardian
BRITTANY R. PETRENY; B.I.M., through
his grandparent and guardian KATHI
MECHELLE REED; C.A.S., through her
parent and guardian PHOENIX
RIESING; D.M.S., through her parent and
guardian PHOENIX RIESING; T.R.,
through his parent and guardian JIM
DOUGLAS CLINTON ROMAN;
REBEKAH LEE ANN SHORT; A.S.,
through her parent and guardian
ROBERT SHUSTER; M.S., through his
parent and guardian ROBERT
SHUSTER; B.A.S., through her
grandparent and guardian ROBIN
ELAINE SLAVEN; C.W., through his
parent and guardian KARA WEYER;
E.W., through her parent and guardian
KARA WEYER; A.E.S., through his
parent and guardian ANDREW E.
SPENCER; J.S.V., through his parent and
guardian ZACHARY ST. VINCENT;
M.S.V., through his parent and guardian
ZACHARY ST. VINCENT;   K.K., through
his parent and guardian SHANTEL
WERNER;  Ko.K., through his parent and
guardian SHANTEL WERNER; Ky.K.,

through her parent and guardian
SHANTEL WERNER; N.B.S.,  through
her parent and guardian  MICHAEL
EDWARD SULLIVAN; K.M., through her
parent and guardian TIFFANY HARVEY;
C.J.Y., through her parent and guardian
MATTHEW SCOTT YOUNG;  J.S.Y.,
through his parent and guardian
MATTHEW SCOTT YOUNG;  and J.Y.,
through her parent and guardian
MATTHEW SCOTT YOUNG; DAVID
SCOTT ZAMPEDRI; TRISHA JEAN
LEMASTERS;

                  Plaintiffs,

      v.

UNITED STATES; EUGENE WATER &
ELECTRIC BOARD, an Oregon
registered electric utility; and LANE
ELECTRIC COOPERATIVE, INC, an
Oregon registered electric utility,

                 Defendants.

## INTRODUCTION

1.      This Complaint arises from the Holiday Farm Fire, which Defendants' powerlines caused on September 7, 2020, in Lane County, Oregon.

2.      In the days leading up to September 7, 2020, the National Weather Service ("NWS") issued numerous dire warnings about unusually dangerous weather conditions expected to strike Oregon. The NWS predicted hot, dry winds from the east that could exceed 60 miles per hour for the evening of September 7th. It repeatedly warned that these conditions would create the perfect environment for wildfires. It even issued the rare "extremely critical" designation, which is reserved only for when forecasters are confident of extremely dangerous wildfire conditions. In response to these warnings, some utilities in Oregon deenergized powerlines when the winds started on September 7, 2020. Their decisions saved lives and spared property.

3.      Defendants knew about the extreme threat of wildfires on the evening of September 7, and that keeping their powerlines energized would create an extreme risk, if not a certainty, of wildfires. Despite this knowledge, , Defendants continued to energize their powerlines. Defendants also failed to remove trees that, because of the likelihood that wind would cause the trees to fall onto the lines and ignite a fire, posed a danger to their powerlines and to the public.

4.      When the strong, dry winds arrived on the evening of September 7, 2020, multiple trees that Defendants should have removed fell onto their powerlines, the powerlines ignited surrounding vegetation, and the ignitions

COMPLAINT - Page 4

quickly grew into two uncontrollable wildfires that merged together and created the Holiday Farm Fire.

5.     The resulting fire in the Holiday Farm area was devastating. Over 170,000 acres burned. Hundreds of homes, schools, and businesses were destroyed. People's priceless possessions were incinerated. Their beloved pets and other animals suffered horrific deaths. For some, everything they had spent a lifetime gathering was lost. The wedding ring from their grandmother ruined. Their child's first set of shoes blackened beyond recognition. Irreplaceable pictures left in ashes.

6.     Many people, including the Plaintiffs who were in the area that the fire impacted, suffered serious ongoing personal injuries as a result of wildfire smoke, including harm to the heart, lungs, and other vital organs, and increased risk of stroke, heart attacks and respiratory problems. And all because Defendants continued to energize their powerlines and failed to remove dangerous trees.



*A firefighter risks his life to battle the Holiday Farm Fire. Photo taken from the KPIC, Channel 4 website.*

*A small statute is all that is recognizable from an area where a library once stood. Photo by Andy Nelson/The Register-Guard and published in The Bulletin.*



7.     Plaintiffs now sue Defendants to recover damages for some of the harm they suffered. They make the allegations in this complaint based on personal knowledge, information and belief, and/or the investigation and research of counsel.

PARTIES

## I.     Plaintiffs

8.     Plaintiffs are individuals, representatives, and legal entities. At all times relevant to this pleading, Plaintiffs were homeowners, renters, business owners, residents, and occupants of real property located in Lane County, and/or had a property interest located therein. The Holiday Farm Fire injured Plaintiffs personally, interfered with their personal rights and interests in their property, and/or destroyed or damaged their property.

9.     Plaintiffs have elected to join their individual lawsuits in a single action under rules of permissive joinder as set forth in Rule 20(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs do not seek class certification or relief on any collective basis. Instead, they seek damages and other remedies on an individual

basis.

10.     The Holiday Farm Fire was ignited on September 7, 2020, and was extinguished no sooner than October 29, 2020.

11.     The Plaintiffs listed on Exhibit A (hereafter the "FTCA Plaintiffs"), have complied with the notice requirement of the Federal Tort Claims Act, 28 U.S.C. § 2401(b). They gave the United States formal and actual notice of their claims on September 1, 2022, or on December 5, 2023.

12.     The FTCA Plaintiffs' notice was timely because their tort claims against the United States did not accrue until January 2025, which is when the United States released the United States Forest Service's Report of Investigation (USFS Report), which determined that powerlines owned and/or operated by the Bonneville Power Administration (BPA), a federal agency, were involved in igniting the Holiday Farm Fire. Because that determination required expert analysis and evidence that was not publicly available to Plaintiffs, Plaintiffs could not have known of BPA's involvement in the Holiday Farm Fire ignitions until the USFS Report was released.

13.     Moreover, regardless of when the FTCA Plaintiffs' tort claims against the United States accrued, their notice was timely due to equitable tolling based on extraordinary circumstances. BPA's involvement in the Holiday Farm Fire required expert analysis and access to evidence available only to the United States. In addition, the United States fraudulently concealed its involvement. The United States failed to release the USFS Report until January 2025, even though it had

COMPLAINT - Page 7

received FOIA and/or Touhy requests from at least three different requesters starting as early as June 2022. The United States destroyed evidence without authorization at the ignition site despite the USFS's instruction to preserve it. The United States created and released a document called "Holiday Farm Fire Outage Sequence of Events," which falsely represents that the BPA line that carried current and sparked one of the Holiday Farm Fire's ignitions was deenergized at the time.

14.     The Plaintiffs listed on Exhibit B (hereafter the "OTCA Plaintiffs") have complied with ORS 30.725's 180-day notice requirement for actions against public entities, as amended by Executive Order 20-03, House Bill 4212, and Executive Order 21-15, by giving defendant Eugene Water and Electric Board (EWEB) formal and actual notice of their claims on the following dates in 2021: April 16, June 2, August 14, September 24, and September 28.

## II.    Defendants

15.     Defendant United States, through BPA, owns and operates powerlines and other electric equipment and infrastructure ("electric utility infrastructure") in the Pacific Northwest, including in Lane County, Oregon. BPA is an administration within the Department of Energy of the United States, based in the Pacific Northwest with its Administrator and office headquarters located in Portland, Oregon, as established pursuant to the Bonneville Project Act of 1937, 16 U.S.C. § 832(a).

///

16.    Defendant EWEB is an Oregon Corporation doing business as a public utility in Oregon. EWEB's primary place of business is at 500 East Fourth Avenue, Eugene, Oregon 97401. It conducts regular, sustained business in Oregon. It owns and operates an electric utility infrastructure in Oregon to transmit, supply, and provide electricity to public and private consumers. EWEB is a public entity.

17.    Defendant Lane Electric Cooperative (LEC) is an Oregon Corporation doing business as a public utility in Oregon. LEC's primary place of business is at 787 Bailey Hill Road, Eugene, Oregon, 97402. It conducts regular, sustained business in Oregon and Lane County. It owns and operates an electric utility infrastructure in Oregon to transmit, supply, and provide electricity to public and private consumers.

### JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court with respect to claims against BPA pursuant to 28 U.S.C. §1346(b) because the claims seek to impose liability for the negligent or wrongful acts or omissions of United States employees acting within the scope of their official duties.

19.    Jurisdiction is proper in this Court with respect to claims against EWEB and LEC under 28 U.S.C. § 1367 because the claims against EWEB and LEC are so related to the claims against the United States that they form part of the same case or controversy.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to the claims occurred within this judicial

COMPLAINT - Page 9

district, and all Defendants own and operate electrical utility infrastructures in this judicial district.

**ALLEGATIONS**

**I.     Defendants have a duty to safely maintain and operate their electric utility infrastructures.**

21.     Defendants supply electricity in the Holiday Farm area. They own, operate, maintain, and repair electric utility infrastructures that transmit electricity to utility customers and to residents, businesses, schools, and industries in Oregon, including in and around the ignition points of the Holiday Farm Fire.

22.     Operating high-voltage electric equipment as part of an electric utility infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity through overhead powerlines in vegetated areas requires Defendants to exercise care to protect the public and the communities in which their electric utility infrastructures operate. Moreover, Defendants have a level of expertise about the operation of electric utility infrastructure far beyond that of a layperson.

23.     Oregon lawmakers recognize that Defendants' electric utility infrastructures pose real and significant fire threats. As Governor Kate Brown's Wildfire Council stated in its Recommendations on Utility Preparedness: "As the frequency, intensity and duration of wildfires has increased in the West, there is a need to have electrical companies take measures to reduce the risk of these events. For example, powerline fires are on average ten (10) times larger than fires from other causes."

COMPLAINT - Page 10

24.     Defendants have a duty to adequately operate, monitor, maintain, and repair their electric utility infrastructures to ensure that they do not cause fires. This duty includes not continuing to energize their powerlines during periods of critical fire risk, to prevent fires and to allow first responders to safely access ignited areas to put out fires. Defendants' duty also includes not allowing anything around their infrastructure and equipment (including land, vegetation, objects, and structures) to exist, develop, or grow, such that it is likely to come into contact with their electric utility infrastructures in such a way as to cause a fire or otherwise endanger the public.

## II.     Defendants knew about the extreme fire risk on Labor Day 2020.

25.     Due in part to extreme drought conditions as designated in the U.S. Drought Monitor on both sides of the Cascade Mountains through 2020, fire potential was well above normal levels at the beginning of September 2020.

26.     Starting on Wednesday, September 2, 2020, the NWS began issuing warnings about dangerous weather conditions for fires in Oregon. The NWS noted that beginning on Monday, September 7, 2020—Labor Day—there would be gusty offshore winds leading to "fire weather concerns[.]"

27.     On Friday, September 4, 2020, the NWS continued to issue warnings about the weather that would begin the following Monday. The NWS predicted winds of a magnitude that one would expect to see "once every 30 years." The NWS warned that, as "a result . . . fire weather concerns abound." The NWS recognized that this was "an unusual amount of lead time for a watch[.]" But because of "the

COMPLAINT - Page 11

high level of confidence in a strong east wind event," the NWS felt it was "prudent to give fire officials as much time to prepare as possible." The NWS urged "extreme caution[.]" In issuing this warning, the NWS specifically identified geographic areas of concern, including an area that covered the Holiday Farm area. It also again identified "Monday evening" as when the extreme winds would begin and create the "potential to see rapid fires spread[.]"

28.     On Saturday, September 5, 2020, the NWS issued a Red Flag Warning that would begin at noon on Monday (Labor Day) and end at 10:00 p.m., on Tuesday and predicted extreme winds between 35 and 50 miles per hour. The NWS issues a Red Flag Warning when "warm temperatures, very low humidities, and stronger winds are expected to combine to produce an increased risk of fire danger."

29.     On Sunday, September 6, 2020, the NWS reiterated that there were "many concerns" about the winds beginning Monday evening. Among those concerns was "the extreme fire danger[.]" And by Sunday evening, the NWS identified 8:00 p.m., Monday through 1:00 p.m., Tuesday as the most concerning period.

30.     The NWS continued to issue warnings in the hours leading up to the evening of Monday, September 7. On the morning of September 7, 2020, the NWS informed the public that they were on "track for an extremely dangerous period of fire weather[.]" Winds were expected to reach speeds of 60 to 80 miles per hour. The conditions put much of Oregon—including the Holiday Farm area—in the

"Extremely Critical" category. This rare category is reserved for situations in which forecasters are confident about extremely dangerous wildfire conditions on a given day. Before September 7, 2020, the NWS had placed Oregon in this category only twice before, in the summer of 2000. Thus, by the morning of September 7, 2020, Defendants knew that there was an extreme fire risk throughout Oregon, including in the Holiday Farm area.

31.     On the evening of September 7, 2020, at about 8:00 p.m., Governor Kate Brown's chief of staff organized a call that included several electric utilities, including BPA. During that call, Doug Grafe, Chief of Fire Protection of the Oregon Department of Forestry ("ODF"), advised the utilities to deenergize their lines to prevent ignition of additional wildfires.

## III.   Defendants knew what to do to prevent wildfires during extreme weather conditions.

32.     Well before the ODF advised the utilities to cease energizing their powerlines on Labor Day 2020, Defendants knew that ceasing to energize powerlines was an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events.

33.     As early as 2013, electric utilities on the West Coast had adopted plans requiring intentional temporary outages to prevent fires. BPA's 2020 Wildfire Mitigation Plan (page 15) identified "de-energization of lines during certain conditions" as one of the "activities that address wildfire risk factors."

34.     By September 7, 2020, it was the generally accepted practice for

electric utilities on the West Coast to have a plan to deenergize their powerlines during the conditions that existed on the evening of September 7, 2020. Indeed, many utilities in Oregon deenergized their powerlines in anticipation of the high winds that blew through on Labor Day 2020. Pacific Power, one of the utilities that failed to do so, has already been found liable by an Oregon jury for the wildfires its powerlines caused.

## IV.    Defendants' actions and inactions led to two different fire ignitions on the evening of September 7, 2020.

35.    There were two ignition points of the Holiday Farm Fire.



36.    One ignition occurred on the evening of September 7, 2020, sometime between approximately 5:25 p.m. and 9:12 p.m., near mile post 41 of Highway 126, where one or more trees that BPA should have removed crashed onto the segment of BPA's Cougar–Holden Line that runs between the Blue River Tap and the Cougar Powerhouse (BPA's Blue River-Cougar Line).

COMPLAINT - Page 14

37.     This ignition (the MP 41 Ignition) occurred in one of two ways. Either BPA's Blue River-Cougar Line was energized when it hit the ground after the tree(s) fell on it, and the line ignited the vegetation below it, or the tree(s) falling on BPA's Blue River-Cougar Line deenergized the line, but the line became reenergized at about 8:00 p.m. that day, as alleged in paragraph 44 below.

38.     Immediately after the tree(s) fell on BPA's Blue River-Holden Line at approximately 5:25 p.m., various breakers opened automatically, deenergizing various BPA, EWEB, and LEC powerlines running to and from the Holden Creek Substation, LEC's Blue River Substation, the Cougar Powerhouse, and the Carmen Smith Powerhouse (these lines, substations, powerhouses, breakers, and other connected electric utility equipment and infrastructure are collectively referred to as the Carmen–Holden Circuit).

39.     Many of the Carmen-Holden Circuit lines remained deenergized until at least 8:00 p.m. on September 7, 2020, including the EWEB line that runs between the Carmen Tap and the Carmen Smith powerhouse (the EWEB Line), and the segment of BPA's Cougar–Holden Line that runs between the Blue River Tap and the Cougar Powerhouse (BPA's Blue River-Cougar Line).

40.     However, because automatic reclosing had not been disabled on breakers 7170 and 7180 at the Holden Creek Substation, those breakers closed within approximately one minute after opening at 5:25 p.m., and BPA's Holden-Blue River Line was reenergized even though the line was not visually inspected to determine the cause of the fault. BPA's reenergized Holden-Blue River Line

COMPLAINT - Page 15

reenergized LEC's Blue River Substation and the LEC distribution lines powered from that substation (LEC's Line). BPA's Holden-Blue River Line and LEC's Line remained energized until breakers 7170 and 7180 automatically opened again at approximately 8:25 p.m.

41.    Another ignition occurred at about 8:00 p.m. on September 7, 2020, near mile post 47 of Highway 126, when one or more trees that EWEB should have removed fell on EWEB's Line on the south side of the highway.

42.    The fallen trees caused EWEB's Line to sag and come into contact with LEC's Line where the lines crossed each other on the north side of Highway 126 near mile post 47.

43.    Immediately after EWEB's Line, which was deenergized, contacted LEC's Line, which was energized, EWEB's Line became reenergized, and EWEB's Line ignited the fallen trees and other vegetation with which it was already in contact on the south side of Highway 126 (the MP 47 Ignition).

44.    In addition to causing the MP 47 Ignition, after EWEB's Line became reenergized, it was able to carry current back to BPA's Blue River-Cougar Line because the Carmen Tap had not been opened. BPA's reenergized Blue River-Cougar Line ignited the fallen trees and other vegetation with which it was already in contact, causing the MP 41 Ignition (unless the MP 41 Ignition had already occurred as alleged in paragraph 37 above).

45.    Despite the NWS's warnings, the other information Defendants knew about the extremely high risk of fire that day, and Defendants' knowledge that

COMPLAINT - Page 16

there were numerous trees adjacent to their powerlines that were likely to come into contact with their electric utility infrastructures in such a way as to cause a fire, Defendants continued to energize powerlines on the Carmen-Holden Circuit until the time of the MP 47 Ignition. If Defendants had deenergized these lines prior to that time, the Holiday Farm Fire would not have occurred. The Holiday Farm Fire also would not have occurred if BPA and EWEB had properly identified and removed trees that posed a threat to their lines.

46.     The Holiday Farm Fire eventually destroyed over 170,000 acres. It killed at least one person, injured countless others, and caused millions of dollars in property damage.

**V.     Defendants' actions foreseeably led to Plaintiffs' harm.**

47.     Defendants knew that any fire started on September 7, 2020, would be almost impossible to contain due to conditions that were known or predicted, including strong, hot, dry winds; the wind direction and speed (including gusts reaching up to 50 miles per hour); the area's existing topography, geography, and ecological and drought conditions; high fuel loads; high energy release conditions; limited escape routes; limited access for firefighters and emergency personnel; and limited firefighting resources available due to fires elsewhere. These same conditions made it foreseeable that the wildfire that Defendants' powerlines started would spread to Plaintiffs' properties and cause their property loss, given the close proximity of Plaintiffs' properties to the Holiday Farm fire ignition points and presence in the fire's burn area.

48.     Defendants' conduct caused flames, smoke, embers, ash, odors, gases, and airborne particles to come into contact with, be deposited on, damage, destroy, and/or otherwise trespass on Plaintiffs' real and personal property, causing extremely hazardous and unhealthy conditions, and interfering with Plaintiffs' right to enjoy their properties. This interference is ongoing, as Plaintiffs face an ongoing risk of harm to themselves and their property from rockfall, flooding, debris flows, diminished drinking water quality, decreased soil productivity, and increased noxious weed spread – all caused by the Holiday Farm Fire.

49.     Defendants' conduct caused Plaintiffs to suffer substantial harm to their persons, interests, and property including, but not limited to, interference with their personal rights and interests in their use and quiet enjoyment of their real and personal properties; interference with their normal and usual activities; personal injuries including irritation of the eyes and respiratory tract, coughing, phlegm, wheezing, and difficulty breathing; fear for their lives and personal safety, mental suffering, emotional distress, stress, anxiety, annoyance and inconvenience; medical bills; increased risks of emergency room visits, hospital admissions, and premature death; horrific death of beloved pets and other animals; damage to and destruction of real property; damage to and loss of structures, personal property, and cherished possessions; out-of-pocket expenses directly incurred as a result of the fire; additional living expenses; evacuation expenses; uncompensated time engaged in recovery efforts; lost wages; loss of earning capacity; and loss of business income and goodwill.

## FIRST CLAIM FOR RELIEF

### Negligence

### (Asserted by the FTCA Plaintiffs Against the United States Only)

50.    Paragraphs 1-49 are incorporated into this claim for relief.

51.    The provision of electrical power involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

52.    BPA has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructures including vegetation management efforts.

53.    Prior to and on September 7, 2020, BPA had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required BPA to maintain a vegetation management program for the control of vegetation surrounding BPA's exposed powerlines.

54.    BPA's employees were required to comply with the safety requirements incorporated into its contracts. For example, BPA was required to adhere to Good Utility Practice, which was defined in its Open Access Transmission Tariff as (a) any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period; (b) any of the practices, methods and acts which, in the exercise of

COMPLAINT - Page 19

reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition; or (c) acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

55.    BPA's employees were required to comply with the requirements of its internal plans and procedures. For example, the BPA 2020 Wildfire Mitigation Plan stated that, during periods of high fire risk, employees were required to either disable automatic reclosers or visually inspect lines that have faulted before reenergizing them. BPA's vegetation procedures, including TLM-STD-7-2-1, required its employees to identify and timely remove trees and other vegetation that were a present or future hazard to its transmission lines.

56.    BPA's duty of care also required it to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions, and to take special precautions to protect nearby properties from wildfires caused by BPA's electric utility infrastructure.

57.    BPA breached its duties by, among other things:

    a. Operating and maintaining its electric utility infrastructure in a manner that violated its Open Access Transmission Tariff and its Wildfire Mitigation Plan, and was inadequate to withstand the foreseeable risk of wildfires;

    b. Maintaining and inspecting vegetation within proximity to its

energized powerlines in a manner that violated its Open Access Transmission Tariff and its vegetation procedures, including TLM-STD-7-2-1, and was inadequate to mitigate the foreseeable risk of fire;

c. Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

d. Keeping breakers closed during extremely dangerous wildfire conditions;

e. Keeping breakers set on automatic reclose during extremely dangerous wildfire conditions;

f. Reenergizing powerlines it owned, operated or controlled, including its Holden-Blue River Line, after a fault on its Blue River-Cougar Line at approximately 5:25 p.m., on September 7, 2020;

g. Reenergizing its electric utility infrastructure after vegetation fell on its powerlines;

h. Failing to inspect its powerlines after vegetation fell on them;

i. Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure and the surrounding vegetation; and/or

j. Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

///

COMPLAINT - Page 21

58.     In engaging in the conduct alleged in the preceding paragraphs, BPA employees violated contracts and procedures that they were required to follow, failed to adhere to objective standards of care, and negligently exercised their professional and scientific judgment.

59.     BPA knew of the extreme fire danger on September 7, 2020, and it breached its duty of reasonable care to the FTCA Plaintiffs by acting unreasonably in light of that knowledge. The Holiday Farm Fire, including the MP 41 Ignition and MP 47 Ignition, was a direct and legal result of BPA's breach of its duties of reasonable care to the FTCA Plaintiffs.

60.     BPA acted intentionally with indifference to the probable and foreseeable consequences of its acts and omissions. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

61.     The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## SECOND CLAIM FOR RELIEF

### Trespass

### (Asserted by the FTCA Plaintiffs Against BPA Only)

62.     Paragraphs 1-61 are incorporated into this claim for relief.

63.     On September 7, 2020, the FTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The

FTCA Plaintiffs' possessory interests in their properties was exclusive.

64.　　BPA negligently, recklessly, and/or intentionally took action that caused the MP 41 and MP 47 Ignitions, resulting in a fire that spread out of control, which harmed the FTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the FTCA Plaintiffs' real and personal property.

65.　　BPA knew that a trespass would result from its actions. BPA's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

66.　　The FTCA Plaintiffs did not grant permission for any fire to enter their properties.

67.　　This trespass was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

68.　　The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

### THIRD CLAIM FOR RELIEF

#### Nuisance

#### (Asserted by FTCA Plaintiffs Against BPA Only)

69.　　Paragraphs 1-68 are incorporated into this claim for relief.

70.　　On September 7, 2020, the FTCA Plaintiffs were the owners, tenants,

and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The FTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

71.    BPA owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

72.    BPA's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

73.    These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the FTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

74.    These conditions affected a substantial number of people at the same time.

75.    At no time did the FTCA Plaintiffs consent to BPA's actions in creating these conditions.

76.    An ordinary person would be reasonably annoyed and disturbed by BPA's actions that created these conditions.

///

77.    BPA's actions in creating these conditions were a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

78.    BPA's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the FTCA Plaintiffs' use and enjoyment of their real and personal property.

79.    The harms caused by BPA were unique to each FCTA Plaintiff and different from damages suffered by other FTCA Plaintiffs and from the general public.

80.    Whatever benefit to BPA its behavior may have provided was outweighed by the harm its operations imposed on the FTCA Plaintiffs.

81.    The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be provide at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## FOURTH CLAIM FOR RELIEF

### Negligence

### (Asserted by All Plaintiffs Against LEC Only)

82.    Paragraphs 1-49 are incorporated into this claim for relief.

83.    Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the

COMPLAINT - Page 25

transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

84.    LEC has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructures including vegetation management efforts.

85.    Prior to and on September 7, 2020, LEC had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required LEC to maintain an appropriate vegetation management program for the control of vegetation surrounding LEC's exposed power lines. This duty also required LEC to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required LEC to take special precautions to protect nearby properties from wildfires caused by LEC's electric utility infrastructure.

86.    LEC breached its duties by, among other things:

    a.    Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

    b.    Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

    c.    Continuing to energize its powerlines despite the extreme fire risk on the evening of September 7, 2020;

COMPLAINT - Page 26

     d.   Continuing to energize its powerlines after a fault occurred on a BPA line at approximately 5:25 p.m. on September 7, 2020, without first determining the cause of the fault and evaluating the risk associated with continuing to energize its powerlines;

     e.   Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

     f.   Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

87.    LEC knew of the extreme fire danger that the conditions on September 7, 2020, created, and it breached its duty of reasonable care to Plaintiffs by acting unreasonably in light of that knowledge. The Holiday Farm Fire was a direct and legal result of LEC's breach of its duties of reasonable care to Plaintiffs.

88.    LEC acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

89.    Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

///

## FIFTH CLAIM FOR RELIEF

### Trespass

### (Asserted by All Plaintiffs Against LEC Only)

90.     Paragraphs 1-49 and 82-89 are incorporated into this claim for relief.

91.     On September 7, 2020, Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. Plaintiffs' possessory interests in their properties was exclusive.

92.     LEC negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which harmed Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property.

93.     LEC's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

94.     Plaintiffs did not grant permission for any fire to enter their properties.

95.     This trespass was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

96.     Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## SIXTH CLAIM FOR RELIEF

### Nuisance

### (Asserted by All Plaintiffs Against LEC Only)

97.     Paragraphs 1-49 and 82-96 are incorporated into this claim for relief.

98.     On September 7, 2020, Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

99.     LEC owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

100.    LEC's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) obstructed the free passage or use, in the customary manner, of public streets and highways.

101.    These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

102.    These conditions affected a substantial number of people at the same time.

103.    At no time did Plaintiffs consent to LEC's actions in creating these conditions.

COMPLAINT - Page 29

104. An ordinary person would be reasonably annoyed and disturbed by LEC's actions in creating these conditions.

105. LEC realized or should have realized that the objectionable condition posed an unreasonable risk of fire that could spread and cause harm to Plaintiffs' persons, interests, and property.

106. LEC's actions in creating these conditions were a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

107. LEC's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their real and personal property.

108. The harms caused by LEC were unique to each Plaintiff and different from damages suffered by other Plaintiffs and from the general public.

109. Whatever benefit LEC realized by its behavior was outweighed by the harm its operations imposed on Plaintiffs.

110. Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## SEVENTH CLAIM FOR RELIEF

### Negligence

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

111. Paragraphs 1-49 are incorporated into this claim for relief.

112.     Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

113.     EWEB has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructures including vegetation management efforts.

114.     Prior to and on September 7, 2020, EWEB had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required EWEB to maintain an appropriate vegetation management program for the control of vegetation surrounding EWEB's exposed power lines. This duty also required EWEB to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required EWEB to take special precautions to protect nearby properties from wildfires caused by EWEB's electric utility infrastructure.

115.     EWEB breached its duties by, among other things:

   a. Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

COMPLAINT - Page 31

b.  Maintaining and inspecting vegetation within proximity of its energized powerlines in a manner that did not adequately mitigate the foreseeable risk of fire;

c.  Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

d.  Keeping breakers closed during extremely dangerous wildfire conditions;

e.  Keeping breakers set on automatic reclose during extremely dangerous wildfire conditions;

f.  Energizing its electric utility infrastructure despite the extreme fire risk on the evening of September 7, 2020;

g.  Designing its electric utility infrastructure so that its powerlines crossed over LEC's powerlines without adequate clearance between its powerlines and LEC's powerlines;

h.  Designing or allowing its powerlines to have insufficient tension, resulting in the powerlines sagging and thereby creating a risk of contact with LEC's powerlines;

i.  Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure and the surrounding vegetation; and/or

j.  Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

116.    EWEB knew of the extreme fire danger that the conditions on September 7, 2020, created, and it breached its duty of reasonable care to the OTCA Plaintiffs by acting unreasonably in light of that knowledge. As a result of EWEB's breaches of duty, at least one tree fell on its powerline, causing its line to contact LEC's line, creating an arc or otherwise energizing its line, and thereby causing the MP 41 and MP 47 Ignitions, which spread rapidly out of control. Consequently, the Holiday Farm Fire was a direct and legal result of EWEB's breach of its duties of reasonable care to the OTCA Plaintiffs.

117.    EWEB acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

118.    The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## EIGHTH CLAIM FOR RELIEF

### Trespass

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

119.    Paragraphs 1-49 and 111-118 are incorporated into this claim for relief.

120.    On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The

OTCA Plaintiffs' possessory interests in their properties was exclusive.

121.    EWEB negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which damaged the OTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the OTCA Plaintiffs' real and personal property.

122.    EWEB knew that a trespass would result from its actions. EWEB's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions and inactions.

123.    The OTCA Plaintiffs did not grant permission for any fire to enter their properties.

124.    This trespass was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

125.    The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## NINTH CLAIM FOR RELIEF

### Nuisance

### (Asserted by OTCA Plaintiffs Against EWEB Only)

126.    Paragraphs 1-49 and 111-125 are incorporated into this claim for relief.

127.    On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The OTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

128.    EWEB owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

129.    EWEB's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

130.    These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the OTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

131.    These conditions affected a substantial number of people at the same time.

132.    At no time did the OTCA Plaintiffs consent to EWEB's actions that created these conditions.

133.    An ordinary person would be reasonably annoyed and disturbed by EWEB's actions in creating these conditions.

COMPLAINT - Page 35

134.   EWEB's actions in creating these conditions were a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

135.   EWEB's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the OTCA Plaintiffs' use and enjoyment of their real and personal property.

136.   The harms caused by EWEB were unique to each OTCA Plaintiff and different from damages suffered by other the OTCA Plaintiffs and from the general public.

137.   Whatever benefit EWEB realized by its behavior is outweighed by the harm its operations imposed on the OTCA Plaintiffs.

138.   The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## PRAYER FOR RELIEF

Plaintiffs seek:

(a)   Damages on an individual basis in amounts as shall be proven at trial;

(b)   Reasonable attorney's fees and costs to the extent permitted under ORCP 68B;

///

COMPLAINT - Page 36

    (c)      Twice the amount of their economic and property damages, to the extent permitted under ORS 477.089(2)(b); and

    (d)      Any other relief as the Court shall deem proper, all according to proof.

### JURY TRIAL REQUEST

Plaintiffs request a jury trial on all claims for relief for which a jury trial is available under the law.

Dated: April 4, 2025             Singleton Schreiber LLP

                          By:

                                */s/ Susan B. Dussault*
                                Gerald Singleton, OSB #210955
                                gsingleton@singletonschreiber.com
                                Susan B. Dussault, OSB #021125
                                sdussault@singletonschreiber.com
                                Singleton Schreiber LLP
                                Stephen J. Hill, OSB #240164
                                shill@singletonschreiber.com
                                591 Camino de la Reina, Suite 1025
                                San Diego, CA 92108
                                Tel.  (619) 771-3473

                                Attorneys for Plaintiffs